## L. SIMPSON LUMBER CO. v. CRAIG et al.
### No. 1424.

Court of Civil Appeals of Texas. Eastland.
May 17, 1935.

Rehearing Denied June 14, 1935.

Marshall & Perkins, of Quanah, for appellant.

D. J. Brookreson, Jas. A. Stephens, and L. M. Williams, all of Benjamin, for appellees.

LESLIE, Justice.

This suit was instituted by W. W. Clark and wife, Evelyn Clark, and G. H. Craig and wife, Cora Craig, to cancel a note and lien against the alleged homestead of the Clarks in Truscott, Tex., and to cancel a deed of trust lien against the alleged homestead of the Craigs in Munday, Tex. The defendant, L. Simpson Lumber Company, answered by general. denial, and, by way of cross-action, asserted the validity of the liens and sought their foreclosure against the respective residences. The trial was before the court and jury, and upon answers to special issues, judgment was rendered in favor of the plaintiffs as prayed

for. The parties will be referred to as in the trial court.

From the standpoint of the plaintiffs, the suit proceeds upon the theory that the residences were the respective homesteads of the plaintiffs at the time the liens sought to be canceled were created, and that each of said transactions was merely a "pretended sale" or mortgage of the respective homesteads for the purpose of securing a debt and therefore void. The lumber company appeals assigning various errors. The first contention made is that there is no evidence that the deed from the Clarks to Craig was a mortgage or pretended sale with conditions of defeasance, but that the evidence conclusively shows the transaction to be a bona fide sale, and, second, that there was no evidence that the Craig residence in Munday was their homestead at the time of the execution and delivery of the deed of trust thereon. To reflect our conclusions upon the questions presented, a statement and analysis of the record must be made. In doing this, a history of related transactions will have to be given.

July 10, 1929, W. W. Clark and wife, Evelyn Clark, together with B. L. Chesser and Annie Chesser, executed to the L. Simpson Lumber Company six promissory notes, each in the sum of $4,614.26, due respectively January 1, 1930 to 1935. For the purpose of securing the payment of these notes, Clark and wife and B. L. Chesser executed to the lumber company a deed of trust on lots 11 and 12, in block 23, in the town of Truscott, known and hereafter referred to as the hotel property. They also executed a chattel mortgage on the furniture, etc., to secure the six notes. Note No. 1 was paid, but upon the happening of a certain contingency, note No. 2 and the other notes of the series were declared due and payable. Note No. 2 is the basis of the instant suit and will be referred to as such.

As the due date of note No. 2 (January 1, 1931) approached, the Clarks were apprehensive that they would not be able to pay same, and they began negotiations with the lumber company to have its due date extended until January 1, 1936. The lumber company was not unwilling to grant the extension, but called for additional security. The Clarks informed Mason Harwell, the agent of the company, that they were unable to furnish any security, except their residence in Truscott. This proposal was rejected by Harwell upon the ground that a mortgage against a homestead was void. At this juncture, and in accordance with the appellees' testimony, through Mrs. Clark, the suggestion was made by Harwell that the residence be sold and the notes or consideration therefor be furnished as the collateral. The witness for the lumber company denied that any such suggestion was ever made by them, but it is the appellees' testimony alone which we shall consider in the disposition of this case.

Thereafter, on July 16, 1930, the Clarks executed to G. H. Craig their general warranty deed to their Truscott residence on lots 4, 5, and 6, block 35. The consideration paid was a $5,000 vendor's lien note, payable to the order of the Clarks on or before five years, etc.

As additional security for the payment of the $5,000 note, Craig and wife executed to Clark a deed of trust on lots 5 and 6 in block 112, Reeves and Musser addition to the town of Munday. The Craigs moved from their Munday residence to the Clark residence in Truscott somewhere around the last of July or the first of August, 1930. Under the testimony, it becomes a material issue in this case as to the time the Craigs' homestead rights at Munday ceased. This phase of the case will be discussed further on.

August 20, 1930, the Clarks transferred to the lumber company the $5,000 vendor's lien note for the purpose of furnishing additional security for hotel note No. 2, and to obtain an extension of the due date thereof until January 1, 1936, which was granted.

During the years 1930 and 1931, G. H. Craig actually made payments on the $5,000 note sufficient to meet the interest due thereon July 16, 1931. Some of these payments were made direct to the lumber company, and the others were remitted to the company by the Clarks. All such credits were entered on the $5,000 note and simultaneously given as credits on hotel note No. 2.

On October 29, 1931, Craig and wife by general warranty deed reconveyed to Clark and wife the Truscott residence for a consideration recited to be "the full and final payment" of the above-mentioned $5,000 vendor's lien note. Thereupon the Craigs moved back to their old home at Munday and the Clarks reoccupied their former home at Truscott. The Clarks then demanded of the lumber company the return

of the $5,000 note which they asserted had been paid by the Craigs. This reoccupancy by the parties of their former homes was without the knowledge or consent of the lumber company, and at a time when the $5,000 note was held as security for hotel note No. 2.

Further, the record discloses that in 1932 W. W. Clark and wife, Evelyn Clark, B. L. Chesser and Annie Chesser were adjudged bankrupts and were later discharged. The Truscott Hotel was rejected as a valuable asset of the bankrupt estate and all interest was disclaimed therein by that court.

In October, 1932, the Truscott Hotel was sold under the deed of trust securing said series of notes, and the property was bid in by the lumber company for $5,500. The hotel furniture, etc., was also sold under the terms of the chattel mortgage and bid in by the lumber company for $1,100. The amount of these bids was credited by the lumber company ratably on hotel notes 2, 3, 4, 5, and 6. After such credit, there remained a balance of principal, interest, and attorney's fees on hotel note No. 2 of $4,250 as of date of the trial. Since the debt as to the Clarks had been discharged in bankruptcy, the defendant in its cross-action merely sought judgment of foreclosure on the Truscott and Munday residence properties to enforce the payment of this unpaid balance, etc.

In answer to the special issues, the jury found that Mason Harwell, the duly authorized agent of the lumber company, induced Mrs. Evelyn Clark "to consummate the deal in question in the way and manner the same was made for the purpose of securing the $5,000 vendor's lien note" against the Clark property, as well as the deed of trust lien against the Craig property as additional security for said note No. 2, and that the deed executed by the Clarks conveying their residence on lots 4, 5, and 6, block 35, in Truscott, Tex., to G. H. Craig was not intended as a "bona fide sale" of the property to said Craig.

As noted, the defendant lumber company attacks these findings as being unsupported by any evidence, and contrary to the undisputed testimony. Further, and as a part of such contention, it asserts that a transaction by which the husband and wife sell their homestead and accept in payment therefor the purchaser's note secured by the vendor's lien retained in the deed does not come within the constitutional inhibition against "pretended sales" of, and certain mortgages and liens upon the homestead, even though the husband and wife at the time of making such sale intend to pledge, and do thereafter pledge such vendor's lien note as security for, and also an extension of, a pre-existing debt.

█ It is well settled that neither the Constitution, nor any statute of this state inhibits the pledging of the proceeds of the sale of a homestead as security for pre-existing indebtedness in order to obtain an extension of the same. 22 Tex. Jur. 130, § 92. Obviously, there is a clear distinction between giving a mortgage on a homestead to secure a debt, and selling the same and pledging the note or other consideration obtained therefor as security for another debt owed by the vendors of such homestead.

█ After a careful study of the plaintiffs' (appellees') pleadings and testimony in the instant case, we readily reach the conclusion that said transaction between the Clarks and Craigs, whereby the former deeded to the latter their Truscott residence, was in fact a bona fide sale of said property, and that the deed was not at the time when made intended by the parties as a mortgage or "pretended sale." We believe that said testimony conclusively so shows. In other words, a bona fide sale of the Clark residence was the "way and manner" adopted by the parties to furnish the additional security and attain the needed extension of time for payment, etc. At the time of the transaction, all parties may have intended and understood that the $5,000 note would be pledged to the lumber company as additional security, etc., for note No. 2, but neither the law nor the Constitution forbids such a transaction. Hence, the $5,000 note is a valid obligation in the hands of the lumber company.

Since we have so concluded, we shall point to the record and the plaintiffs' (appellees') testimony which, in our judgment, compels this conclusion: In order to consummate the deal with the Clarks, the Craigs were required to execute a deed of trust on their Munday residence as additional security for the $5,000 vendor's lien note given by them for the Clarks' Truscott residence. The following provision, taken from the deed of trust, and disclosing the nature of the transaction between Craigs and the Clarks, is given: "We further agree that we will use due diligence and sell said property in Munday,

Texas, being lots Nos. 5 and 6 in Block 112 Musser & Reeves Addition procuring therefor the best cash payment obtainable without causing delay, and take vendor's lien notes for the balance on such terms as we see fit and to apply the cash payments so received on said $5,000 note in favor of W. W. Clark and wife Evelyn Clark, and to deliver such notes as may be taken for the same to be held with said $5,000 note, for collection and collateral and when such notes, or any part thereof are paid same is to be credited on said $5,000 note."

Further, the plaintiffs (appellees) in their pleadings alleged a reconveyance of the Truscott property by the Craigs, etc. but they did not allege that such action was taken in pursuance of any agreement or understanding between the parties at the time the original deed and deed of trust were executed. These allegations are as follows: "That said G. H. Craig was not able during the first year after said exchange of places had been made to find a purchaser for said home at Munday, Texas, and on account of the general depressed financial conditions then existing was not able to sell same so he could not buy these plaintiffs' home in Truscott as was the original intention."

In another place they allege: "That afterwards, plaintiffs herein, G. H. Craig and wife, Cora Craig, were not able to pay said $5,000 note, nor any part thereof and the plaintiffs W. W. Clark and wife, Evelyn Clark were forced to accept as payment thereof from said plaintiffs a deed reconveying to them the legal title to their said homestead, which said deed was duly executed by said plaintiffs under date of October 29, 1931 for the consideration which is recited therein of the full and final payment of said $5,000 Vendor's Lien note which had been so signed by the said Craig and wife, Cora Craig, and which said $5,000 note had also been described in a certain deed of trust dated July 16, 1930."

The material testimony bearing upon the true nature of the transactions in question was given in behalf of the appellees by Mrs. Evelyn Clark, one of the plaintiffs. According to the testimony, she had worked in the First Bank of Truscott for "many years," had owned an interest therein, had been vice president of that bank for "several" years, had been "active manager" of it for many years, "had been taking notes from people * * * for several years," was "not inexperienced in the matter of the execution of notes," and "knew it was a dangerous business," etc. Her testimony upon the trial of the case is in part as follows

"Q. Just how did you ever start this trade by which you conveyed your home in Truscott to Henry Craig? A. The notes on the hotel were large in 1930 and the depression was on and the note wasn't due until 1931 but I began to worry about it, my brother and sister was on the note with us and I made a date with Mr. Harwell to see about getting an extension on the paper that was due in '31, and he said what did I have that I could put up as collateral and I told him that I didn't have anything more than my homestead, and he said I couldn't give a mortgage on my homestead, but that if I could sell it, I could put up the notes; and I didn't know of anybody that I could sell it to except Henry Craig, I knew he had been trying to buy Jack Brown's place, and so I thought if I could sell it and get a note against it, I would do it in order to save the hotel; and when I went back home I saw Mr. Craig and he said that he would like to buy our home but that he didn't have any money, and that was how come us to get a lien on the home. * * *

"Q. When you went to Craig, you went to see him, did you? A. He was in Truscott and come in the bank and I mentioned it to him and told him my condition and asked him what about it and he said he would like to have our home but said he didn't have any money to pay down, and I asked him if he would put up his home at Munday against it and then maybe he could sell it later and pay it out, but he didn't have any money to pay on it at all; but I thought that by getting a vendor's lien note it would give us a chance to save the hotel and the Simpson Lumber Company had promised to carry this over for a number of years if we would put up some collateral. * * *

"Q. Did Mr. Harwell say anything to you about how to fix the note? A. He said I couldn't give a deed of trust on it, but I could sell my home and get a note and put the note up as collateral, and they would extend it over until 1936. * * *

"Q. Who suggested that Henry give you a deed of trust on his place? A. Mr. Harwell and I talked about it and he said by getting a deed of trust it would make

both of us safe and I could put my note up against the hotel note and I told him I didn't want to lose my home and he said there wasn't any danger of losing it because the Simpson Lumber Company had always been lenient and would be. * * * "

On cross-examination:

"Q. You sold the property to Mr. Craig, didn't you? A. Yes, sir, for the purpose of creating a lien to secure Simpson Lumber Company. * * *

"Q. You just figured on selling it (the home) to Craig for $5,000, didn't you? A. If he could pay for it, I could turn around and buy another one. * * *

"Q. And that when he paid that $5,000 note the Truscott property would become his? A. Yes sir, I suppose it would.

"Q. That was your understanding with Craig? A. Yes, but he never did pay for it. * * *

"Q. But you did figure you were selling your home to Mr. Craig, didn't you? A. Yes, I sold it for that purpose, to create a lien to put up to Simpson Lumber Company to secure this hotel note; I would have given him a deed of trust if he would have taken it.

"Q. And the intention between you and Craig was that the property was to become his if he paid this $5,000 note? A. I suppose it would have, we never did discuss that. * * *

"Q. Was there any agreement between you and Craig that he was to deed back your property to you? A. No, I told him I was going to put the note up.

"Q. You told him you was going to put it up with Simpson Lumber Company? A. Yes sir.

"Q. And he knew that at the time he executed the deed of trust on the Munday property, he knew that you was going to put this note up with Simpson Lumber Company? A. Yes sir.

"Q. And at that time he agreed to sell the Munday property if he could? A. Yes, but he couldn't.

"Q. And agreed to apply the proceeds on that $5,000 note, didn't he? A. I guess he would but he couldn't sell it. * * *

"Q. Did you collect any rentals from that Munday property? A. Some.

"Q. What did you do with them? A. I sent them to Mr. Harwell to pay on these notes. * * *

"Q. You say that Mr. Craig wanted to buy a home in Truscott? A. Yes sir, and I heard it and asked him about selling him ours.

"Q. It was your understanding that he was buying your property for the purpose of making that his home, wasn't it? A. I don't know whether he was going to make that his home or not, we was just trying to save ourselves. * * *

"Q. For what purpose was he buying it then? A. I don't know; he just bought it, I just offered to sell it to him in order to get this note because Mr. Harwell told me he wouldn't take a deed of trust on my home. * * *

"Q. You know what it means to sell property, don't you? A. Yes sir.

"Q. You know the difference between a sale and a mortgage? A. Yes sir.

"Q. Did you think you were selling it to Craig? A. I sold it for the purpose of creating a lien to secure Simpson Lumber Company.

"Q. You were not mortgaging it, were you, Mrs. Clark? A. No sir.

"Q. You didn't understand that you were mortgaging that property? A. I didn't know, that was the way I sold the home.

"Q. You tell the jury that you do know the difference between a sale and a mortgage? A. Yes sir. * * * "

Recross-examination:

"Q. Was it your understanding that if he sold his home in Munday, he would pay this note? A. I suppose so because we had the note out against it."

Brooks Chesser, a brother of Mrs. Clark, also a maker of the hotel notes, and who was present at the negotiations with Mr. Harwell for a rearrangement of the hotel notes, testified in substance the same as Mrs. Clark. In part he testified: "We saw we could not meet that note when it came due; I was surety * * * and I wanted to see about it and he said that they could carry it if we would put up additional security, and Mrs. Clark said she didn't have anything but her home and he said if she could sell it and turn it into notes they could handle the notes. * * *

"Q. And he told them to sell the home? A. He said it was a good idea.

"Q. He told them a deed of trust on it wouldn't be any good? A. Yes sir.

"Q. And a mortgage on the homestead wasn't any good? A. Yes sir.

"Q. And had to sell it? A. Yes, sir, or turn it into notes.

"Q. If they couldn't sell it for cash to sell it for notes? A. Yes sir.

"Q. So what they did do was to sell it? A. Yes sir.

"Q. To whom did they sell it? A. G. H. Craig. * * *",

W. W. Clark, the husband of the witness, Evelyn Clark, testified briefly at the trial of this case, but his testimony contained nothing material on the vital issues of the lawsuit. His testimony will not be set out since he frankly stated that his wife handled the deals both with the Craigs and the lumber company, and that he knew nothing about them except what Mrs. Clark and Chesser told him.

Giving the fullest effect to this testimony and all reasonable implications therefrom, the most that can be said of it is that the homestead was sold for the purpose of using the purchase-money notes to put up with the defendant as collateral security for note No. 2, and in consideration of an extension of the time of its payment, etc. Mrs. Clark's testimony, taken together with all the other evidence in the case, is wholly devoid of any suggestion that there was at the time of the making of the deed to the Truscott property any agreement, express or implied, that there was to be no real sale, or that that sale was to be subject to any condition of defeasance. It is, therefore, our conclusion that there was no evidence to support the finding of the jury that that transaction was not a bona fide sale. The testimony warrants no other conclusion than that it was in fact a sale.

■ Under another phase of the pleadings, the plaintiffs—especially the Clarks—claim the right to have the entire proceeds of the sale of the hotel property and fixtures applied first to the payment of note No. 2 so as to discharge the same and release the $5,000 note should the latter be found to be a valid lien against the Clark residence. In such event, they claim to have re-established their homestead by re-occupying it after its reconveyance by the Craigs.

We are of the opinion that the plaintiffs are not entitled to any such application of said funds. The deed of trust covering the Truscott Hotel secured alike each of the five unpaid notes. The chattel mortgage on the furniture and fixtures secured said notes in like manner. This chattel mortgage stipulated that the proceeds of the sale of the furniture, etc., should be applied to the payment of "said indebtedness in such manner as the mortgagee may elect." In accordance with this provision, the proceeds of the sale of the furniture, etc., were applied pro rata to each of the five unpaid hotel notes. When the hotel, or real estate, was sold under the deed of trust, the proceeds from that sale were applied ratably to the five notes, which included note No. 2 in suit.

Obviously, these funds were properly applied. The payment of the indebtedness against the hotel by sale of that property under deed of trust was an involuntary payment, and as said in Miller v. White (Tex. Civ. App.) 264 S. W. 176, 179: "It is a general rule that a payment of an indebtedness by the sale of mortgaged real property is an involuntary payment, as to which neither the debtor nor creditor has the right to make an application under the rules governing voluntary payments; but the application should be usually pro rata. Where payments are involuntary, the creditor has no right of appropriation, but must apply the money toward the discharge of all the debts in proportion." Citing authorities.

For other authorities, see Blair v. Teel (Tex. Civ. App.) 152 S. W. 878; Orleans County Bank v. Moore, 112 N. Y. 543, 20 N. E. 357, 3 L. R. A. 302, 8 Am. St. Rep. 775; 32 Tex. Jur. p. 690, § 32; 48 C. J. p. 642, § 86 et seq.

Further, it is obvious that the so-called marshaling of assets contended for by the appellees would be inequitable under the circumstances of this case. To hold that the appellees had the right to require that all the proceeds of the sale of the hotel and fixtures be first applied to the payment of note No. 2 (for which alone the $5,000 vendor's lien note was pledged as security) would be to hold that the contract, by which that note was put up as security to note No. 2, was meaningless, or without purpose. It would amount to the Clarks saying to the defendant, "We put this note up as additional security for note No. 2, but we require you to sell all your original security for the entire series of notes, and apply the proceeds thereof to the payment of note No. 2 and thereby discharge the only obligation which the $5,000 note was

designed to secure." We conclude that the appellees have no just grounds to complain of the application of the proceeds of the sale of the hotel and fixtures. After these applications, the unpaid balance on the five hotel notes was approximately four times that of the $5,000 note. The balance on note No. 2 itself was $4,250 at the time of trial.

The foregoing disposes of the material questions affecting the Clarks. We pass to a consideration of the record from the standpoint of the Craigs.

 The jury has found that at the time they executed and delivered the deed of trust on their Munday residence, it was their homestead. An examination of the statement of facts discloses that there is testimony to support that finding. Hence, this court has no authority to disturb the same. We refer briefly to the testimony upon which this conclusion is founded. The deed of trust was signed by the Craigs July 16, 1930, but their acknowledgment thereto was taken July 31, 1930, at Truscott, Tex. The deed was filed for record August 2, 1930. Their occupancy of the Munday homestead did not terminate July 16. July 31 the Craigs were moving. To what extent they had moved is not shown. The homestead nature of the Munday residence until the date of removal is undisputed. As to when they ceased occupancy of that homestead as such, and actually occupied the Truscott property as a new homestead, the testimony of Mrs. Cora Craig is as follows:

"Q. Did you live there (Munday residence) at the time that a deed of trust was executed on the home you had over there? A. Yes sir. * * *

"Q. Mr. Craig bought that house on the 16th of July and the acknowledgment seems to have been taken on July 31st; when did you move to Truscott? A. I think about August 1st. * * *

"Q. Were you living in Truscott when he took your acknowledgment? A. No, at Munday, we were moving. * * *

"Q. It took you two or three days to move and you moved along about August first, is that right? A. Yes sir."

G. H. Craig, the husband of Mrs. Cora Craig, and one of the plaintiffs, did not testify on the trial at all. Upon the same issue, Mrs. Clark testified in part:

"Q. How soon after July 16, did Mr. Craig move into your property? A. I am

not sure, but I don't think they came in until about the 2nd or 3rd of August. * * *

"Q. It could have been along the last of July? A. Probably might have been right at the last day, but the papers were signed before they moved.

"Q. That is Mr. Craig executed the note? A. Yes sir.

"Q. And you didn't move out until about the last of July? A. It was somewhere about the first of August, I couldn't say just when, possibly the 3rd or 4th or 5th."

Clearly, there is evidence to warrant the jury's finding that the Craigs had not ceased to occupy the Munday homestead when the deed of trust was delivered to the Clarks. Their occupancy at that time is the controlling consideration. Archibald v. Jacobs, 69 Tex. 248, 6 S. W. 177; Clem Lumber Co. v. Elliott Lumber Co. (Tex. Com. App.) 254 S. W. 935; Karr v. Cockerham (Tex. Civ. App.) 71 S.W.(2d) 905; Evans v. Galbraith-Foxworth Lumber Co. (Tex. Civ. App.) 51 S.W.(2d) 831; Crawford v. Grand Saline Lumber Co. (Tex. Civ. App.) 281 S. W. 592; Grimes v. Cline (Tex. Civ. App.) 300 S. W. 235; Pierce v. Langston (Tex. Civ. App.) 193 S. W. 745; Neece v. King (Tex. Civ. App.) 73 S.W.(2d) 550; Blanks v. First Nat. Bank of Seymour (Tex. Civ. App.) 44 S.W.(2d) 393; Wilson v. Levy (Tex. Civ. App.) 13 S.W.(2d) 971. Accordingly, we sustain this finding of the jury and uphold that part of the judgment canceling the deed of trust lien as a cloud, or encumbrance, on the Munday homestead of the Craigs. Under this assignment the defendant failed to discharge the burden upon it, of showing there was no evidence to support the finding.

From the foregoing, it follows that the judgment of the trial court, in so far as it canceled the deed of trust lien against the residence property of the Craigs in Munday, Tex., is in all things affirmed. The liability of the Clarks for the payment of note No. 2 having been discharged in bankruptcy, and G. H. Craig having executed and delivered the $5,000 vendor's lien note in suit and pledged to the lumber company, it is the order and decree of this court that the defendant recover of and from said G. H. Craig the sum of $4,250, the unpaid balance on said note as of date June 19, 1934, together with a foreclosure of the vendor's lien securing said $5,000 note as against the residence property of

W. W. Clark and Evelyn Clark, viz., lots 4, 5, and 6 in block 35, in Truscott, Tex., as evidenced by the deed of said property from said Clarks to G. H. Craig. In the event said residence property of the Clarks shall sell for more than enough to discharge the amount remaining unpaid on said note No. 2, such remainder shall be paid to W. W. Clark and Evelyn Clark.

As above indicated, the judgment of the trial court is affirmed in part, and reversed and rendered in part.